IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT KNOXVILLE

JULY 1998 SESSION

FILED

September 10, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | * | C.C.A. # 03C01-9707-CR-00302 |
| Appellee, | * | McMINN COUNTY |
| VS. | * | Hon. Mayo L. Mashburn, Judge |
| TRELVER BRADLEY, | * | (Reckless Homicide) |
| Appellant. | * | |

For Appellant:

Jerry Hoffer, Attorney
275 North Ocoee Street
Suite C
Cleveland, TN  37311

For Appellee:

John Knox Walkup
Attorney General and Reporter

Clinton J. Morgan
Counsel for the State
425 Fifth Avenue North
Second Floor, Cordell Hull Building
Nashville, TN  37243-0493

Steve Ward
Assistant District Attorney General
Tenth Judicial District
P.O. Box 647
Athens, TN  37303-0647

OPINION FILED:_____

AFFIRMED

GARY R. WADE, PRESIDING JUDGE

## OPINION

The defendant, Trelver Bradley, indicted for first degree murder, was found guilty of reckless homicide. The trial court imposed a Range I sentence of four years. The defendant was fined $5,000.00.

In this appeal of right, the defendant complains that the trial court improperly instructed the jury. We find no error and affirm the judgment.

On the night of May 1, 1994, paramedics Curtis Auckerman and Erica Johnson were dispatched to the Lee Manor Apartments due to injuries suffered by Katherina Davis, the four-month-old victim. The paramedics found the child in the custody of her mother, Becky Davis.[1] They rendered emergency treatment and transported the child to the Athens Community Hospital. At trial, Auckerman testified that the mother did not blame or implicate anyone else for the injuries suffered by the victim. Ms. Johnson recalled that the victim's crib was dirty and unkempt.

Dr. Kimberly Breeden, a pediatrician, treated the victim during the early morning hours of May 2, 1994. She discovered internal injuries, a fracture to the skull, and numerous other fractures. Dr. Breeden believed that the victim had been brutally beaten and shaken.

---

[1] In State v. Becky Davis, No. 03C01-9701-CR-00027 (Tenn. Crim. App., at Knoxville, May 1, 1998), a panel of this court reversed her first degree murder conviction by acts of aggravated child abuse. Tenn. Code Ann. § 39-13-202(a)(4) (Supp. 1994). Ms. Davis and the defendant were tried separately. In Davis, this court determined that the trial court had committed reversible error by failing to instruct the jury on criminal responsibility for facilitation of a felony. See Tenn. Code Ann. § 39-11-403(a). It was determined that facilitation of a felony was a lesser included offense of criminal responsibility and that the failure to charge the offense violated the constitutional rights of the defendant. The panel concluded that "there was evidence upon which reasonable minds could convict [Davis] of facilitation of first degree murder." Davis, slip op. at 17. No Rule 11 application was filed by the state.

2

Detective Bill Matthews of the Athens Police Department investigated the incident. While at the hospital, he observed that the victim had extensive bruising. During his initial discussions with Ms. Davis, she did not mention the defendant, obviously made no accusations against him, and protested her own innocence. Detective Matthews described Ms. Davis as being unemotional at the time. Ms. Davis was jailed on a charge of child abuse before the death of the victim, which occurred about three months later as a result of her injuries. After she was jailed, she contacted Detective Matthews and accused the defendant of causing the injuries.

Dr. Charles Harlan testified that the cause of death was cerebral atrophy caused by a blunt trauma to the head. Dr. Clifford Meservy, a pediatric radiologist, testified that a CAT scan and x-rays of the victim showed a brain abnormality caused by intense shaking. He also discovered multiple rib and bone fractures, both old and new, which were indicative of child abuse.

Detective Don Long of the Athens Police Department testified that three weeks after the victim's injuries, he had questioned the defendant, who was sixteen years old at the time of the offense. He recalled that the defendant denied ever having been alone with the victim and asserted that he had not seen Ms. Davis since several days before the offense. About seven weeks later, the defendant acknowledged that he had been untruthful in his initial statement, admitting that he stayed at Ms. Davis's apartment often; however, he continued to claim that he was not there on the date of the offense at anytime before the victim was injured. Detective Long testified that the defendant admitted that he went to the Davis apartment when he learned that the victim was not breathing; he said he was unable to wake the victim. Other portions of his statement provided as follows:

3

I shook the baby, trying to wake her up, but she wouldn't wake up. I asked Becky what was wrong with the baby's neck ... because I saw some red dots on her neck. They looked like mosquito bites. Other than that, I have never seen any bruises or marks on the baby.

The defendant also admitted that Ms. Davis had complained once that "I was aggravating the baby ... [and] used to get on me a lot about playing rough with the baby." The defendant told Detective Long that he had left the Davis apartment by the time the ambulance arrived.

Michael Cates, who was sitting in his car in the Lee Manor Apartments parking lot on the night the victim was injured, observed the defendant coming in and out of Ms. Davis's apartment around midnight. He stated that the defendant left "for a few minutes or so" before Ms. Davis came to his car and "real scared, hysterical like" informed him that her baby was not "breathing or moving."

Sharon Bradley, who was with Cates at the time, testified that the defendant, who is her cousin, was seeing Ms. Davis in March, April, and May of 1994. Ms. Bradley did not recall seeing the defendant that night but was present when Ms. Davis came to their car, beat on the window, and said, "Sharon, help me, help me, my baby won't wake up." Ms. Bradley stated that she had not seen the defendant on the day of the crime until approximately 1:00 A.M., after the ambulance had left with the victim.

Jowanna Gresham was staying with Sherann McDermott at the Lee Manor Apartments on the night of the victim's injuries. Ms. Gresham acknowledged telling police earlier that the defendant had come to the McDermott apartment and informed her that "the baby wasn't breathing," and asked her to go to the Davis

4

apartment. Ms. Gresham recalled telling police that the defendant had stated that he would not go back to the apartment because "the police were getting ready to come."

Russell Brown, an inmate in the Bradley County Jail at the time of the trial, was called as a witness for the state. While claiming that he was intoxicated on the night that he gave the police a statement about this incident, he recalled telling Detective Matthews that the defendant had once picked the baby up by its clothes and dropped her about two feet into her crib, causing the baby to cry. He stated that the defendant did not seem concerned after the incident. Sabrina Kimson, whose sister is the mother of a child fathered by the defendant, testified that she had once seen the defendant flip the victim "on the top of the head" because the victim was crying. Ms. Kimson recalled that when she cautioned the defendant, he answered, "I don't care, it's not my baby." She also remembered the defendant once saying that the baby "got on his nerves."

Gary Jackson, a student at the American Trucking Center in Nashville, was aware of the relationship between the defendant and Ms. Davis. He recalled that after the victim had suffered her injuries, the defendant had first informed him that "the baby fell between the bed," and later said "that he didn't drop the baby... [and] that [the baby] had ... fallen." Jackson also recalled the defendant saying that Ms. Davis would not "tell on him" and that if she did, he would "kill that bitch." Jackson testified that the defendant admitted being there at the time the victim was injured but denied being responsible for her death.

Martin Pierce, who visited the Lee Manor Apartments often, recalled a conversation he had with the defendant several days after the victim was injured.

5

Pierce stated that the defendant said, "Yes, I did it, but I'm not going to take the fall for it. She is. If she says anything, I'll kill the bitch." Pierce testified that the defendant left Athens for a month or so after he had been questioned by police.

Detective Matthews, who also testified as a part of the defense proof, revealed that Ms. Davis had four other children, each with a different father, all of whom were in the custody of others. One of the children, Detective Matthews determined, also had suffered a skull fracture, which was later ruled as accidental by the Atlanta Police.

Melinda Kimson, testifying for the defense, stated that she and the defendant had a one-year-old child together but no longer maintained a relationship. She recalled that Pierce, who was related to the defendant by marriage, had pursued her "since high school" and still "harassed" her. She claimed that Pierce had threatened to "find a way to get back at" the defendant. She described Pierce as jealous of the defendant.

Vicky Gresham also testified for the defense. She claimed that she had overheard a conversation between Jackson and the defendant wherein the defendant said, "Why does everybody keep tripping like this? ... I didn't kill that baby. I didn't kill that baby."

Sherann McDermott testified that the defendant came to her door on the night of the victim's injuries and informed her that "something was wrong with Becky's baby." She described the defendant as nervous, "just like the rest of us." Ms. McDermott conceded that the defendant must have been there when the baby quit breathing and would have been lying to police if he said otherwise.

6

During deliberations, the jury asked the trial judge whether or not two people could be responsible for the death of the minor child. Over objection by the defense, the trial judge then instructed the jury as follows:

> And my instruction ... is that each person that's tried for an offense must be judged upon the evidence pertaining to that ... person and not to somebody else. But two or more people may be responsible, depending upon the circumstances, for the commission of the same crime.

When the foreperson of the jury also asked for clarification on the actual cause of death, the trial court referred the jury to the written instructions.

The defendant first complains the additional instructions should have been in writing. He also complains that the trial judge's comments were highly prejudicial because they allowed for a finding of reckless homicide. The defendant asserts that the following instruction should have been given:

> The defendant is criminally responsible for an offense committed by another if the defendant solicits, directs, aids, or attempts to aid another person to commit an offense, and the defendant acts with intent to promote or assist the commission of an offense or benefit in the proceeds of the results of the offense.

Tennessee Pattern Instructions Criminal (3d ed.) 3.01.

Rule 30(a) of the Tennessee Rules of Criminal Procedure generally requires all instructions to be in writing. Oral instructions not in conflict with an accurate written charge are not necessarily erroneous. State v. Gorman, 628 S.W.2d 739 (Tenn. 1982). Where a trial judge's response to the jury's question does "not differ from or alter the charge that had previously been given in writing," the response is not required to be in writing. State v. Barnard, 899 S.W.2d 617, 623 (Tenn. Crim. App. 1994). Our review is limited because the written instructions are not included in the record.

The defendant also complains about the content of the instruction provided, as opposed to its form. Without knowing what instructions were given, we cannot review the case. Moreover, the transcript of the hearing on the motion for new trial has not been made a part of the record. It is, of course, the duty of the appellant to establish a sufficient record for adequate review. Tenn. R. App. P. 24. Absent that, the appellant is not entitled to relief. Our presumption must be that the charge was in compliance with the Tennessee Pattern Instructions. Had the jury been accurately charged, the answer given by the trial judge would not, in our view, prejudice the rights of the defendant in any manner.

Accordingly, the judgment is affirmed.

_____
Gary R. Wade, Presiding Judge

CONCUR:


_____
Joseph M. Tipton, Judge


_____
David H. Welles, Judge

8